UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:05-CR-105 |
| | ) | JUDGE COLLIER |
| MARCUS GABLE KING | ) | MAGISTRATE JUDGE CARTER |

REPORT AND RECOMMENDATION

I. Introduction

The Defendant, Marcus Gable King, has filed a motion to suppress statements he made to law enforcement personnel on the ground that he was not advised of his *Miranda* rights before he gave the statements and that the statements were not freely and voluntarily given (Doc. No. 47). This motion is before the undersigned Magistrate Judge having been referred by the District Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons stated herein, it is RECOMMENDED defendant's motion to suppress be DENIED.

II. Relevant Facts

A hearing was held on the defendant's motion to suppress on Monday, December 12, 2005. Detective Van Hinton, Detective Andy Browne, and Lt. Tommy Farmer, all of the Hamilton County Sheriff's Department, and U.S. Postal Inspector Dianne Bracken testified at the hearing. On the basis of their testimony, which I found credible, I make the following findings of fact:

On August 19, 2005, Federal Inmate Gerald Wayne Phillips escaped from the Hamilton County Jail. The Hamilton County Sheriff's Department was notified of the escape and detectives immediately started investigating the escape. At about 3:30 a.m. on August 20, 2005,

Det. Hinton and Det. Browne along with about ten officers from the Hamilton County Sheriff's Department, the United States Marshals Office, and the Bradley County Sheriff's Department arrived at Marcus King's home at 1530 Blythe Ave, Cleveland, Tennessee, to search for Phillips. Marcus King's identity and involvement in the escape were ascertained from monitored phone calls made from the jail by Phillips and inmate interviews Lt. Farmer conducted at the Hamilton County Jail after Phillips' escape. Police also knew that King had been Phillips' cell mate when King was incarcerated at an earlier time. While Hinton and Browne went to Cleveland to look for Phillips, Lt. Farmer remained in Chattanooga to continue the investigation there.

Neither Hinton nor Browne were involved in the initial entry into King's house at 1530 Blythe Avenue where it was suspected that Phillips was hiding, but both stated that it was policy when tracking a known violent offender such as Phillips to enter the residence with guns drawn. After the entry team secured the residence by conducting a sweep to make certain the fugitive was not there and to rule out any other armed persons in the residence, Hinton and Browne entered. Hinton and Browne did not have their weapons drawn and the other officers had also holstered their weapons as the house had been secured. Some of the officers had also begun to remove their bullet proof vests. After speaking with Wayne Smith, Marcus King's uncle and roommate, at the door of the residence, Det. Hinton and Det. Browne were shown by Mr. Smith to Marcus King's bedroom in the rear of the house. King was standing in the doorway of his bedroom. He had been awakened by the entry team. Hinton introduced himself to Marcus King and immediately advised him of his *Miaranda* rights. Det. Browne witnessed Det. Hinton advise King of his rights. King readily agreed to speak with law enforcement officials without a lawyer being present. After some discussion, King admitted that he had spoken to Phillips on the phone

2

and, as agreed between himself and Phillips, had driven to a Sports Bar in Chattanooga to pick up Phillips after he had escaped from jail on the night of August 19, 2005. King further stated that when arrived at the bar, he was told Phillips had left about fifteen minutes earlier. According to King, Phillips had told him he was going to be released from jail on bond, and Phillips wanted King to meet him at the bar. Det. Hinton did not believe this last piece of information, and he told King he was under arrest for aiding and abetting an escaped prisoner and would be transported back to the Hamilton County Jail. Hinton told King he was in serious trouble and he could help himself by cooperating, but Hinton made no promises that King would not be prosecuted or that he would receive any type of sentencing deal if he cooperated. Rather, Hinton told King if he cooperated in capturing Phillips, Hinton would inform the U.S. Attorney, his attorney, and the Court of his cooperation. Hinton emphasized to King that his sentence would ultimately be determined by the Court. King agreed to cooperate and, in fact, seemed eager to do so.

At approximately 4:00 a.m. on August 20, 2005, Hinton transported King back to the Hamilton County Sheriff's Narcotics Division offices where King spent the next day and a half in a 10' x 10' conference room attempting to locate Phillips by making numerous phone calls to Phillips' friends and family. During this time, King was taken outside the room for cigarette and bathroom breaks as requested and brought food on numerous occasions. Hinton frequently asked King if he was doing alright or if he needed anything. Hinton also told King to call his uncle because his uncle continued to call Hinton to check on his nephew's welfare. King napped by putting his head on the table or by lying in two chairs pushed together. In fact, King obtained more sleep than most of the officers working the case during that 36 hour period. King never

3

indicated to the officers that he was not alright or that he wished to discontinue cooperating or that he wanted an attorney. Rather, he appeared very willing to help. Hinton explained that the reason for not transporting King to the jail was the need to make King immediately available for any return phone calls from Phillips or his relatives which might reveal Phillips' whereabouts.

At 11:19 a.m on August 20, 2005, during the time that King was cooperating with police efforts to find Phillips, Marcus King signed a Waiver of Rights form. The document represents the second time that King waived his *Miranda* rights. Lt. Farmer testified he asked King to sign the waiver "out of caution." After King signed the waiver, Lt. Farmer and Assistant U.S. Attorney Steve Neff interviewed King. King appeared to Lt. Farmer to be very willing to help find Phillips and no promises were made to King to give him a lighter sentence or not to prosecute him if he cooperated. Lt. Farmer told King only that he would inform the Court and the U.S. Attorney of King's cooperation. Later, at approximately 4:30 p.m. on August 20, 2005, Postal Inspector Diane Bracken interviewed King. She brought to him a copy of his written waiver that he had signed earlier and gave him orally his *Miranda* rights again. Her interview lasted approximately one to two hours during which time King admitted that he had been involved in two or three plots to help Phillips escape from jail. Also during the time Bracken interviewed King, he was brought food and allowed at least one bathroom and cigarette break. No promises or threats were made to induce King to cooperate. On the contrary, he appeared very willing to help.

III. Argument and Law

In his motion to suppress, the defendant argues he was not given *Miranda* warnings before making his initial statements to police, thus those statements and all subsequent

4

statements made to police on August 20 and 21, 2005, should be suppressed. At the hearing held on December 12, 2005, defendant also argued that his statements were coerced and should be suppressed for that reason.

*A. Miranda Warnings*

The Fifth Amendment and the Due Process Clause of the Fourteenth Amendment require a defendant to be advised of his *Miranda* rights prior to custodial interrogation or statements made to police must be suppressed. *Dickerson v. United States*, 530 U.S. 428, 443-444 (2000); *Miranda v. Arizona,* 384 U.S. 436, 477 (1966); *Biros v. Bagley,* 422 F.3d 379, 389 (6th Cir. 2005). In the instant case, Detective Hinton advised the defendant of his *Miranda* rights immediately upon encountering the defendant. Defendant gave no statement to police before Hinton mirandized him. Police then gave the defendant *Miranda* warnings at least two more times before additional statements were given. Thus, there is no basis to suppress his statements given on August 20 and 21, 2005 for failure to advise the defendant of his *Miranda* rights.

At the December 12, 2005 hearing, the defendant also argued, in the alternative, that even if police did give him his *Miranda* warnings, his statements were not voluntarily made and should, therefore, be suppressed. The Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment require that a statement or confession be voluntary to be admitted into evidence. *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004); *Dickerson*, 530 U.S. at 433. The government bears the burden to prove by a preponderance of the evidence that the confession or statements were voluntary. *Seibert*, 542 U.S. at 608 n. 1; *United States v. Ostranda*, 411 F.3d 684, 696 (2005), *cert. denied*, 126 S.Ct. 469 (Oct. 11, 2005); *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.), *cert. dened*, 504 U.S. 945 (1992). That

5

*Miranda* warnings were given prior to custodial interrogation does not necessarily render a statement or confession voluntary. *Dickerson*, 530 U.S. at 444; *Ostrander*, 411 F.3d at 684, 696. Nevertheless, "'cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'" *Seibert*, 542 U.S. at 609 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433, n. 20 (1984)). Whether a confession was voluntarily given requires an inquiry into "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Buustamonta*, 412 U.S. 218, 223 (1973)). In making this inquiry, the court must consider the totality of the circumstances, "both the characteristics of the accused and the details of the interrogation." *Dickerson*, 530 U.S. at 434 (internal citations omitted). "The determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" *Dickerson*, 530 U.S. at 434 (brackets original) (quoting *Stein v. New York*, 346 U.S. 156, 185 (1953)). Factors to consider may include:

> (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993).

*Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004); *see also United States v. Wiley*, 2005 WL 1285712 (6th Cir. May 26, 2005). "Coercive police activity is a necessary element for finding that a confession was involuntary." *Abela*, 380 F.3d at 928 (citing *Colorado v. Connelly,* 479 U.S. 157, 167 (1986)). Promises of leniency and threats of prosecution may also be forms of coercion which overbear an accused's will and render a confession or statement involuntary.

*United States v. Johnson,* 351 F.3d 254, 261 (6th Cir. 2003); *Wrice*, 954 F.2d at 411. In the instant case, the defendant argued at the December 12, 2005 hearing that police promised him if he cooperated in the investigation and in finding Phillips, he would not be prosecuted. If police had made such a promise prior to defendant's statements, defendant's statements would have to be suppressed. *See Johnson*, 351 F.3d at 262 (a broken promise not to prosecute in exchange for cooperation constitutes coercion which requires suppression.) I found, however, that no promises had been made to the defendant not to prosecute him in exchange for his cooperation – police only promised to inform the Court and the United States Attorney of his cooperation if, in fact, he helped. Furthermore, the defendant was specifically told his sentence would be determined by the Court, not by the United States Attorney. Such a promise to inform the prosecutor of the defendant's cooperation has been previously held to be noncoercive, *Wiley*, 2005 WL 1285712 **4, and I concur in light of the totality of the circumstances. The defendant was given his *Miranda* rights at least three times. He had previous involvement with law enforcement, and I conclude he was familiar with "the system." He was not reluctant to cooperate; on the contrary, he was quite eager. He was treated politely and respectively. He was frequently asked if he needed anything and if he was "alright." When requested, he was given bathroom breaks, food, and smoke breaks. I am not unmindful of the fact that the defendant went for more than a 24 hour period without sleeping in a bed; however, police frequently checked on his welfare and defendant indicated he was fine. He was allowed to take naps and was willing to stay in the conference room to continue helping police find Phillips. Thus, considering the totality of the circumstances, I conclude defendant's statements were voluntarily given, and defendant's motion to suppress should be denied.

## IV. Conclusion

For the reason stated herein, it is RECOMMENDED that defendant's motion to suppress (Doc. No. 47) be DENIED.[1]

               s/William B. Mitchell Carter
               UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).